

**SIGNED this 17th day of May, 2013**

_____

(NOT FOR PUBLICATION, OPINION HAS
LIMITED PRECEDENTIAL VALUE)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

| | |
|---|---|
| In re: | No. 11-14429 |
| | Chapter 7 |
| RICARDO BLAIR and ZELMA DARVILLE BLAIR, | |
| Debtor; | |
| OAK STREET FUNDING, LLC | |
| Plaintiff, | |
| v | Adversary Proceeding No. 12-1052 |
| ZELMA DARVILLE BLAIR, | |
| Defendant. | |

**MEMORANDUM**

Plaintiff Oak Street Funding, LLC ("Plaintiff" or "Oak Street") brings this adversary proceeding against the defendant debtor Zelma Blair ("Defendant" or "Debtor") alleging that the Debtor has committed fraud or defalcation and engaged in willful and malicious behavior sufficient to deny her a discharge of the debt owed to Plaintiff pursuant to 11 U.S.C. §§ 523(a)(4) and 523(a)(6). [Doc. No. 1, Complaint].[1] The Plaintiff now moves for summary judgment on these claims pursuant to Fed. R. Civ. P. 56, incorporated into adversary proceedings by Fed. R. Bankr. P. 7056. [Doc. No. 41]. The Defendant has failed to file an opposition to the motion for summary judgment.

On January 25, 2013 the Plaintiff filed a Motion to Deem Matters Admitted. [Doc. No. 36]. The motion sought to have the Plaintiff's First Requests for Admission to Defendant to be deemed admitted for purposes of this adversary proceeding due to the Defendant's failure timely to respond to the requests for admission. The Defendant had not responded to the requests for admission within the 30 day time period prescribed by Fed. R. Civ. P. 36(a)(3), incorporated into bankruptcy proceedings by Fed. R. Bankr. P. 7036. Neither the court nor the parties had extended the request for admission deadline. On February 20, 2013 the court granted the motion to deem the requests for admission admitted. [Doc. No. 38]. On February 28, 2013 the Defendant filed *pro se* "Defendant's Answers to Plaintiff's Request for Admissions." [Doc. No. 40]. She denies that the Agency was in default without further explanation and further denies that she intended to defraud or injure the Plaintiff. She does admit she was in control of the Insurance Network, LLC, defined as the "Agency," and that "the Agency would comply with the Agreement." *Id.* The Debtor did not

---

1 All docket entry citations refer to docket entries for Adversary Proceeding No. 12-1052, unless otherwise noted.

file a motion to reconsider this court's order granting the motion to deem the requests for admission admitted or any other motion that would affect the court's prior February 20, 2013 order. Therefore, the court concludes that the Defendant has admitted the statements made in the requests for admission propounded by the Plaintiff for purposes of this motion for summary judgment. The court will view these admissions as undisputed facts for purposes of this summary judgment motion.

The court has reviewed the briefing filed by the Plaintiff, the pleadings at issue, and the applicable law and makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. The court has determined that it will GRANT IN PART the Plaintiff's motion for summary judgment subject to further hearing on the specific amount of the judgment.

## I.     Background

The Debtor and her husband, Ricardo Blair, filed their voluntary Chapter 7 petition for bankruptcy on August 15, 2011. [Bankr. Case No. 11-14429, Doc. No. 1]. The Plaintiff filed a claim in the amount of $46,257.66 on November 16, 2011. [Bankr. Case No. 11-14429, Claim No. 2-1]. The Plaintiff filed this adversary proceeding on June 5, 2012. [Doc. No. 1, Complaint]. In the Complaint the Plaintiff alleges that the Debtor owned and operated Insurance Network, LLC, now known as Blair Network Insurance, LLC ("Agency"). *See* Complaint, p. 2, ¶ 1. The Debtor controlled the day-to-day operations of the Agency from the date of June 27, 2006 through the date of the filing of the bankruptcy petition. [Doc. No. 36-1, Requests for Admission (hereinafter "Requests for Admission"), No. 1].

On June 27, 2006 the Debtor, acting on behalf of the Agency, executed a Term Loan Note ("Note") in the principal amount of $69,200. The Plaintiff attached a copy of the Note as Exhibit 3 to the motion for summary judgment. [Doc. No. 41-3, Note]. *See also,* [Doc. No. 41-2, Ex. 2,

3

Affidavit of Kathy Yeary ("Yeary Aff."), ¶ 3]. On the same day the Debtor also signed a credit agreement ("Credit Agreement") on behalf of the Agency to obtain a non-revolving credit facility in the amount of $69,200 to be evidenced by the Note. A copy of the Credit Agreement is attached to the motion for summary judgment as Exhibit 4. [Doc. No. 41-4, Credit Agreement]. The court will refer to the various documents signed by the parties relating to the Note and Credit Agreement as the "Loan Documents."

The Credit Agreement indicated that "[t]he funds derived by the Borrower from the proceeds of the Term Loan shall be used for <u>expanding office with commercial sales staff</u>." Credit Agreement at ¶ 1(c). It further provided that the Term Loan was to be a secured loan. To that end, the Debtor acting on behalf of Insurance Network, LLC, executed a Security Agreement, attached as Exhibit 5, on June 27, 2006, which granted the Plaintiff a security interest in:

> (i) all commissions and other amounts paid or payable to the Agency with respect to any insurance policies (the "Insurance Policies") associated with the Agency Agreements (collectively, the "Agency Agreements") and Producer Codes (collectively, the "Producer Codes") identified in Schedule A hereto, including without limitation, any insurance policy commissions due on or after the date hereof and all commissions due before the date hereof but received on or after the date hereof (collectively, the "Insurance Policy Commissions") relating to such Agency Agreements and Producer Codes; (ii) the Deposit Account; and (iii) all other business personal property of the Borrower of every kind and nature now existing or hereafter acquired . . . .

[Doc. No. 41-5, ("Security Agreement"), ¶ 2]. The collateral description continued and included all goods, inventory, equipment, accounts, instruments, investment property, and general intangibles in addition to other categories of collateral. *Id*. Schedule A listed several insurance companies, including AIG Indemnity Insurance Company, Appalachian Insurance Company, Dairyland Insurance Company, Infinity Insurance Company, Metropolitan Life Insurance Company, Safeco Insurance Companies, Southern Pioneer P&C Insurance Company, and RPS. *Id.*

4

The Credit Agreement identified a specific bank account as the Deposit Account. It stated that:

> [a]ll of the Insurance Policy Commissions shall be immediately deposited by AIG Indemnity Insurance Company or Borrower, as applicable, within two (2) Business Days of receipt of such funds by AIG Indemnity Insurance Company, Borrower or Oak Street, as applicable, into the Borrower's special demand deposit account maintained by the Borrower with JPMorgan Chase ("Deposit Account").

[Doc. No. 41-4, Credit Agreement, at ¶ 1(e)]. The Credit Agreement also limited the Debtor's access to the funds in the Deposit Account. The Plaintiff could withdraw its payments from the account without notice. Cash from the Deposit Account was only released to the Debtor if certain conditions were met, one of which was that the Agency's annual commissions had to be greater than $32,985. *Id.* The Agency, Insurance Network, LLC, agreed to "[s]ervice the Insurance Policies and the insurance carriers in the ordinary course of its business and in a manner necessary to preserve the Insurance Policies and the Insurance Policy Commissions." *Id.* at ¶ 4(a). The Debtor agreed "that the Agency would deposit Insurance Policy Commissions into the Account accounting within two (2) business days of receipt of such funds." Requests for Admission, No. 3. Under the Credit Agreement the Debtor agreed that "so long as the Agency met its annualized commission requirement ($32,985.00) and maintained funds in excess of $10,380.00, in the Control Account, Oak Street would take its monthly payment from the Control Account and 'sweep back' the excess funds to the Other Account." Requests for Admission, No. 6. She also admitted that "after Oak Street funded the loan in the principal amount of $69,200.00, Insurance Policy Commissions and other funds were regularly deposited in the Control Account and swept-back to the Other Account." *Id.* at No. 7.

Paragraph 7.c. of the Credit Agreement required that the Agency be given notice of a "failure of the [Agency] to keep or comply with any provision of this [Credit] Agreement. . ."

[Doc. 41-4, Ex. 4, Credit Agreement, ¶ 7.c]. One of the provisions of the Credit Agreement prohibited the Agency from requesting or redirecting "any of the commissions associated with the Producer Code(s) or Agent Code(s) identified on Schedule A without the prior written approval of Oak Street." *Id.* at ¶ 5.e. Upon the occurrence of a default, the Note became due and payable without any additional notice. *Id*. at ¶ 7. Oak Street was entitled to possession of its collateral upon default. The Security Agreement allowed the Insurance Companies to be contacted by Oak Street, and it required the Agency to hold the Insurance Policy Proceeds it received in trust after default. [Doc. 41-5, Ex. 5, Security Agreement, ¶ 11].

The Debtor, acting on behalf of the Agency, executed and delivered an account control agreement ("Control Agreement") on June 27, 2006 in which JP Morgan Chase Bank ("Chase Bank"), the depository bank, acknowledged Oak Street's security interest and agreed to follow Oak Street's directions regarding disbursement of the funds in the Deposit Account. [Doc. No. 41-6, Exhibit 6].

In addition to the Agency's execution of the Loan Documents on June 27, 2006, the Debtor also executed a Continuing Guarantee ("Guarantee"). The Guarantee provided in part:

> To induce OAK STREET FUNDING, LLC, ("Oak Street"), whose address for purpose of notice hereunder is 11555 N. Meridian St, Suite 390, Carmel, Indiana 46032 to make loans, extend or continue credit or some other benefit, to or for the benefit of Insurance Network LLC, a Tennessee Limited Liability Company (the "Borrower"), and because the undersigned Zelma Blair (the "Guarantor") has determined that executing this Guarantee is in the Guarantor's interest and to such Guarantor's financial benefit, the Guarantor absolutely and unconditionally guarantees to Oak Street, as primary obligor and not merely as surety, that the Obligations . . . of the Borrower will be paid when due, whether by acceleration or otherwise. . . .

[Doc. No. 41-9, Exhibit 9]. The Debtor's obligation pursuant to the Guarantee was a maximum of $69,200. *Id.* The Guarantee defined "Obligations" as:

6

> all indebtedness, liabilities and obligations of the Borrower to Oak Street, or any of Oak Street's subsidiaries, affiliates or successors, of every type and description, whether now existing or hereafter arising, whether direct or indirect, absolute or contingent, liquidated or unliquidated, due or to become due, . . . including, without limitation, all indebtedness, liabilities and obligations, contingent or otherwise whether now existing or hereafter arising, of the Borrower under a Credit Agreement of even date herewith.

*Id.* The Debtor admits that she "agreed that the Agency would not sell, transfer, dispose of, assign or otherwise encumber any of the assets and properties (including, without limitation, the Insurance Policy Commissions) to anyone other than Oak Street." Requests for Admission, No. 4.

On August 9, 2006 Oak Street perfected its security interest in the collateral by filing a UCC financing statement ("Financing Statement") with the Tennessee Department of State. [Doc. No. 41-10, Ex. 10]. Oak Street filed a continuation statement on February 9, 2011 with the Tennessee Department of State. *Id.*

On March 28, 2007 the Debtor, acting on behalf of the Agency, signed and delivered to Oak Street an amendment to the loan documents which changed the bank account designated for the deposit of the Insurance Policy Commissions from Chase Bank to First Indiana Bank. [Doc. No. 41-7, Exhibit 7]. The Agency also entered into a Deposit Account Control Agreement with First Indiana Bank which replaced the control agreement with Chase Bank. [Doc. No. 41-8, Exhibit 8].

The Plaintiff alleges that the Agency and the Debtor are in default on the various agreements the Debtor signed due to the redirection of the insurance commissions. As of the date of the Debtor's bankruptcy petition, the Agency was in default on its debts owed to Oak Street in the amount of $46,257.66. On July 13, 2010 the Plaintiff sent the Agency a "Notice of Default and Demand for Repayment of Secured Credit Facilities Extended to Insurance Network LLC" ("Notice of Default"). [Doc. No. 41-11, Ex. 11]. The Notice of Default stated that the Agency and

the Debtor were "in default under the terms of the Loan Documents, for among other reasons, failure to make payments when due, and failure to send all commissions to the Cash Collateral Account." *Id.* The Notice of Default further noted that:

> No further loans will be advanced to the Borrowers. Oak Street specifically reserves all remedies available to it, at law or in equity, to enforce the collection from the Borrowers of all outstanding amounts due under the Loan Documents, and all other charges and expenses to which it is entitled to reimbursement, and to accrue interest on the outstanding principal balance of the Loan Documents at the default rate of interest as set forth therein or otherwise. In addition, Oak Street is entitled to recover its attorneys' fees and costs of collection, all as provided in the Loan Documents.

*Id.* The Debtor has admitted that Oak Street informed her that "the Agency was no longer eligible for the 'sweep backs' as it was no longer meeting the annualized commission requirement or sweepback cap." Requests for Admission No. 9. The Debtor has further admitted to failing to respond to the notices of default and failing to redirect more Insurance Policy Commissions into the Account. *Id.* at Nos. 12, 13.

The Debtor also admits the following facts as undisputed by failing to respond to the Plaintiff's Requests for Admission: (1) that she "intentionally redirected the Insurance Policy Commissions away from the Account to the Other Account" (Request for Admission No. 16); (2) she "did not enter into a deposit account control agreement with Oak Street for the Other Account" (Request for Admission No. 17); (3) "Oak Street did not have access to the Other Account" (Request for Admission No. 18); (4) she has "used the Insurance Policy Commissions to pay [her] rental payments and other personal expenses" (Request for Admission No. 19); (5) that "on or about December 22, 2011, [she] filed Articles of Amendment to change the name of the Agency to Blair Network Insurance LLC, in an attempt to hide the Insurance Policy Commissions from Oak Street" (Request for Admission No. 20) and (6) that she was in default on the loan from Oak Street

(Request for Admission, No. 21). The Plaintiff defined Insurance Policy Commission as the definition given in the Credit Agreement. Nowhere in the Request for Admissions is a specific amount given for the amount of commissions diverted.

Through the undisputed Requests for Admission, the Debtor has also admitted several facts relating to violation of a fiduciary duty owed to Oak Street. Such admissions include: (1) that in her "position of control over the day-to-day operations of the Agency, [she] had a fiduciary duty to maintain the Control Account for the benefit of Oak Street" (Request for Admission No. 25); (2) she "owed a fiduciary duty to Oak Street to remit the Insurance Policy Commissions to Oak Street" (Request for Admission, No. 26); (3) Oak Street entrusted her "not to remove, redirect or otherwise compromise the Insurance Policy Commissions or the Control Account into which such Insurance Policy Commissions were deposited" (Request for Admission No. 27); (4) while acting in a fiduciary capacity, she "intentionally and wrongfully, in violation of the Loan Documents, redirected the Insurance Policy Commissions of the Agency to the Other Account and failed to remit to Oak Street the Insurance Policy Commissions in an effort to unlawfully circumvent [her] and the Agency's obligations under the Loan Documents" (Request for Admission No. 28); (5) the Debtor's "redirection of the Insurance Policy Commissions serving as part of Oak Street's Collateral was done with the intent and knowledge to benefit [her] personally at the expense and injury to Oak Street." (Request for Admission No. 29); (6) she knew the "Insurance Policy Commissions were being held for the benefit of Oak Street" (Request for Admission No. 33); (7) she "took willful and affirmative steps to defraud Oak Street by misappropriating the Insurance Policy Commissions" (Request for Admission No. 34); (7) her "redirection" of the Insurance Policy Commissions was a "willful and malicious injury" (Request for Admission No. 35); (8) she knew her actions would cause injury to Oak Street (Request for Admission No. 36); and (9)

"re-directing the Insurance Policy Commissions caused injury to Oak Street by resulting in [her] failure to make the requisite payments on the debt owed by [her] and by the loss of security for the debt owed by [her]." (Request for Admission No. 37).

Exhibit 12 to the motion for summary judgment is a statement of account that demonstrates how much the Debtor and the Agency paid pursuant to the Credit Agreement. [Doc. No. 41-12, Ex. 12]. Exhibit 13 to the motion for summary judgment is an affidavit calculating the Plaintiff's attorneys' fees, costs, and expenses. [Doc. No. 41-13, Ex. No. 13]. Those costs totaled $22,541.27 as of the date of the motion for summary judgment. *Id.* There is not an exhibit calculating the amount of Insurance Policy Commissions redirected.

The Plaintiff asserts a claim of nondischargeability pursuant to 11 U.S.C. § 523(a)(4) and claims that the Debtor owed a fiduciary duty to Oak Street to provide it with the Insurance Policy Commissions. *See* Complaint, ¶ 32. It contends that the Debtor attempted to circumvent her obligations by re-directing the Insurance Policy Commissions. The Plaintiff also asserts a claim of willful and malicious behavior pursuant to 11 U.S.C. § 523(a)(6).

**II.    Standard of Review**

Federal Rule of Bankruptcy Procedure 7056 makes Federal Rule of Civil Procedure 56 applicable to bankruptcy adversary proceedings. *See* Fed. R. Bank. P. 7056. Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th

Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The Defendant has failed to respond to the Plaintiff's motion for summary judgment. However, the Sixth Circuit has cautioned courts in this Circuit that "a district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded. The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged [his burden on summary judgment]." *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991).

**III.   Analysis**

A.   **Plaintiff's 11 U.S.C. § 523(a)(6) Claim**

11 U.S.C. § 523(a)(6) states in relevant part:

A discharge under section 727. . . of this title does not discharge an individual debtor from any debt – . . .

>   (6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . . .

11 U.S.C. § 523(a)(6).

Whether a debt is dischargeable pursuant to 11 U.S.C. § 523(a)(6) is determined by

11

analyzing federal law. *See e.g., J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 800-01 (Bankr. N.D. Ohio 2001) (citing *Call Federal Credit Union v. Sweeney (In re Sweeney)*, 264 B.R. 866, 870 (Bankr. W.D. Ky. 2001); *Hinze v. Robinson (In re Robinson)*, 242 B.R. 380, 388 (Bankr. N.D. Ohio 1999)). 11 U.S.C. § 523(a)(6) provides that a debt that is *both* willful *and* malicious is nondischargeable. *See* 11 U.S.C. § 523(a)(6). "[T]he judgment must be for an injury that is both willful and malicious. The absence of one creates a dischargeable debt." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999). The U.S. Supreme Court has addressed the meaning of "willful" within the context of § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974 (1998). As summarized by the Sixth Circuit:

> [t]he Court held that "willful" means "voluntary," "intentional," or "deliberate." As such, only acts done with the intent to cause injury – and not merely acts done intentionally – can cause willful and malicious injury. The Court explained its holding by discussing the importance of context:
>
>> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences* of an act," not simply "the act itself."

*In re Markowitz*, 190 F.3d at 464 (quoting *Geiger*, 523 U.S. at 61-62, 118 S.Ct. at 977). Following the lead of the Supreme Court in *Geiger*, the Sixth Circuit held that "unless 'the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *In re Markowitz*, 190 F.3d at 464.

Proof of willful behavior must often be demonstrated through the use of circumstantial evidence. *See In re Jones*, 276 B.R. at 802. The bankruptcy court in *In re Jones* noted that "willful" behavior can "be indirectly established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the creditor's lien rights; and (2) the debtor knew that his conduct would cause injury to those rights." *Id.*

As to the element of malice, a malicious injury occurs "when a person acts in conscious disregard of their duties or without just cause or excuse." *In re Jones*, 276 B.R. at 803 (citing *Gonzalez v. Moffitt (In re Moffitt),* 254 B.R. 389, 396 (Bankr. N.D. Ohio 2000)). A finding of maliciousness does not require a determination of ill-will or specific intent. *See Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 308 (B.A.P. 6th Cir. 2004). However, malice requires the finding of a level of conduct beyond negligent or reckless behavior. *West Michigan Community Bank v. Wierenga (In re Wierenga)*, 431 B.R. 180, 185 (Bankr. W.D. Mich. 2010) (citation omitted); *see also, JP Morgan Chase Bank, NA v. Algire (In re Algire)*, 430 B.R. 817, 823 (Bankr. S.D. Ohio 2010); *Geiger*, 523 U.S. at 64, 118 S.Ct. 974.   A creditor may prove the element of maliciousness by demonstrating that "(1) the debtor has committed a wrongful act, (2) the debtor undertook the act intentionally, (3) the act necessarily causes injury, and (4) there is no just cause or excuse for the action." *In re Algire*, 430 B.R. at 823 (citing *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228 (6th Cir. 1991), *abrogated on other grounds by Geiger*, 523 U.S. 57).

In *National Sign and Signal v. Livingston* the district court explained that the § 523(a)(6) exception applies where the injury invades a creditor's legal rights. 422 B.R. 645, 653 (W.D. Mich. 2009) (citing *Steier v. Best (In re Best)*, 109 F. App'x 1, 6 (6th Cir. 2004)). The district court quoted the Sixth Circuit decision in *In re Best* noting:

> Section 523(a)(6)'s term "willful . . . means deliberate or intentional invasion of the

> legal rights of another, because the word 'injury' usually connotes legal injury (*injuria*) in the technical sense, not simply harm to a person." The conduct "must be more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from . . . legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice . . .

*Livingston*, 422 B.R. at 653 (quoting *In re Best*, 109 F. App'x at 6). The court in *Livingston* noted that there are three elements that a creditor must demonstrate to state a claim under § 523(a)(6): "(1) the debtor's conduct was willful and malicious, (2) it suffered an invasion of its legal rights or to the legal rights to its property, and (3) the invasion was caused by the debtor's conduct." 422 B.R. at 653 (citing *CMEA Title Agency v. Little (In re Little)*, 335 B.R. 376, 383 (Bankr. N.D. Ohio 2005)).

The court concludes that the Plaintiff has demonstrated there is no genuine issue of material fact regarding whether the Debtor engaged in willful and malicious conduct such that the debt owed to it by the Debtor is non-dischargeable pursuant to Section 523(a)(6). The court concludes that the Debtor understood the nature of her obligations to the Plaintiff given the extensive Loan Documents that she signed and the personal guarantee that she provided to the Plaintiff. The court further concludes that the facts are undisputed that the Debtor knew that her actions in redirecting funds from the account to which Oak Street had access to the other account to use the funds for her own personal expenses would cause injury to the Plaintiff's rights. Therefore, her actions were willful in nature.

The court also concludes that the record demonstrates that there is no dispute of fact regarding whether the Debtor's conduct was also malicious. The Debtor committed a wrongful act by diverting funds that rightfully belonged to the Plaintiff. The acts were intentional as the undisputed record demonstrates that the Plaintiff changed the name of the Agency and opened a separate bank account and then used Plaintiff's funds for her personal expenses. These actions of

the Debtor caused injury to the Plaintiff as the Debtor defaulted on her obligations under the Credit Agreement. Finally, the Debtor has provided no evidence that there was just cause or excuse for her wrongful actions. Therefore, the court concludes that it will GRANT the Plaintiff's motion for summary judgment on its Section 523(a)(6) claim for the amount of Insurance Policy Commissions redirected and not remitted to Oak Street. However, the court will require a further hearing on the amount of Insurance Policy Commissions.

    **B.**    **Plaintiff's 11 U.S.C. § 523(a)(4) Claim.**

11 U.S.C. § 523(a)(4) states in relevant part:

> (a)    A discharge under 727 . . . of this title does not discharge an individual debtor from any debt—
> . . .
>     (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4). The court notes that it does not need to address the Plaintiff's Section 523(a)(4) claim, as it has determined that the Plaintiff has demonstrated that there is no genuine issue of material fact regarding its Section 523(a)(6) claim, and the court's ruling on the Plaintiff's Section 523(a)(4) claim would be dicta. Further, the court notes that the Debtor did file responses to the Plaintiff's requests for admission, and even though the responses were untimely, the court notes that the Debtor denied defaulting on the terms of the Agreement. [Doc. No. 40, Response to Request for Admission No. 21]. Any trust that existed, and is therefore relevant to the Plaintiff's claim of defalcation, came into being upon an Event of Default under the Security Agreement. *See* [Doc. No. 41-5, Ex. 5, Security Agreement, ¶ 11]. The Debtor belatedly denied any such default in her responses filed *pro se*. Further, the U.S. Supreme Court has recently issued a ruling requiring a culpable state of mind for demonstrating defalcation under Section 523(a)(4). *Bullock v. BankChampaign, N.A.*, __ S.Ct. __ (May 13, 2013). Due to these circumstances, the court

concludes that finding the Debtor's debt to Plaintiff nondischargeable pursuant to Section 523(a)(6) is sufficient and there is no need to address the merits of the Plaintiff's Section 523(a)(4) claim.

### C. Plaintiff's Request for Attorneys' Fees

The Plaintiff further seeks its attorney's fees and costs relating to its claims. The Credit Agreement provides that:

> The Borrower shall reimburse Oak Street for all costs and expenses, including reasonable attorneys' fees, incurred by Oak Street in the collection of the Term Loan as well as all other obligations and liabilities of the Borrower to Oak Street as a result of the occurrence of an Event of Default hereunder or in pursuit of any remedy of Oak Street available to it under or pursuant to this Agreement or any of the other Loan Documents.

[Doc. No. 41-4, Ex. 4, Credit Agreement, p. 10, ¶ 8]. The Security Agreement also provides for the payment of attorneys' fees: "The Agency shall pay to Oak Street on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Oak Street in protecting, preserving or enforcing Oak Street's rights under or in respect of any of the Obligations or any of the Collateral." [Doc. No. 41-5, Ex. 5, Security Agreement, p. 8, ¶ 20]. The Note also states that "[a]ll amounts payable by Maker to Oak Street under this Note shall be without relief from valuation and appraisement laws and with attorneys' fees and costs of collection." [Doc. No. 41-3, Ex. 3, Note, p. 2]. The Continuing Guarantee also provides that the Debtor would pay "reasonable attorneys' fees" "suffered or incurred" by the Plaintiff in enforcing the personal guarantee. [Doc. No. 41-9, Ex. 9, Continuing Guarantee, p. 4].

As the United States Supreme Court has noted, "under the terms of the current Bankruptcy Code, it remains true that an otherwise enforceable contract allocating attorney's fees (*i.e.*, one that is enforceable under substantive, nonbankruptcy law) is allowable in bankruptcy except where the

Bankruptcy Code provides otherwise." *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 127 S.Ct. 1199, 1204 (2007) (citing 4 Collier on Bankruptcy ¶ 506.04[3][a], p. 506-118 (rev. 15th ed. 2006)). In *Travelers Casualty* the Supreme Court determined that "[t]his case requires us to consider whether the Bankruptcy Code disallows contract-based claims for attorneys' fees based solely on the fact that the fees at issue were incurred litigating issues of bankruptcy law. We conclude that it does not." *Id.* at 1204. In *Martin v. Bank of Germantown (In re Martin)*, the Sixth Circuit noted that "creditors are entitled to recover attorney's fees in bankruptcy claims if they have a contractual right to them valid under state law, which appears to be the case here, as the note itself provided that the Martins would reimburse the Bank for the costs and attorney's fees necessary to collect the note. . . . Tennessee state law enforces such contractual obligations for reasonable attorney's fees." 761 F.2d 1163, 1168 (6th Cir. 1985), *overruled on other grounds by Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *see also, Synergeering Group, LLC v. Jonatzke (In re Jonatzke)*, 478 B.R. 846, 869-870 (Bankr. E.D. Mich. 2012). In addition, the Sixth Circuit noted, "a contractual right to attorney's fees is part of the debt to the creditor . . ." *Id.* The Court further concluded that "[w]e do not think that section 523(d) prevents the award of attorney's fees and costs to creditors so entitled as a matter of contract under state law." *Id.*

Here, the Plaintiff can demonstrate several agreements pursuant to which the Debtor agreed to pay attorneys' fees incurred by Plaintiff in trying to enforce the obligations under the various Loan Documents. As the Sixth Circuit explained in *In re Martin*, if the creditor has a "contractual right, it must be assumed they gave value for that right at the time credit was advanced." 761 F.2d at 1168. As the Debtor has failed to raise any arguments suggesting that the Plaintiff is not entitled to its attorneys' fees incurred in pursuing this adversary proceeding and

17

seeking a judgment of nondischargeability, the court concludes that the attorneys' fees incurred are nondischargeable. The Plaintiff has provided evidence that it has incurred $22,541.47 through the date of February 28, 2013 in attorneys' fees and costs to enforce its rights under the Loan Documents. [Doc. No. 41-3, Affidavit of Plaintiff's Attorney Fees, Costs and Expense]. Therefore, the court will GRANT the Plaintiff's motion for summary judgment on its right to have its attorneys' fees in an amount to be established at a subsequent hearing included in the nondischargeable judgment pursuant to its contractual rights under the Loan Documents.

## IV.    Conclusion

As noted *supra*, the court concludes that there is no genuine issue of material fact that the amount of Debtor's debt owed to the Plaintiff equal to the injury caused by the redirection of the Insurance Policy Commissions and for the attorneys' fees related to enforcement of the Loan Documents is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6) and the terms of the Loan Documents. Therefore, the court will GRANT IN PART the Plaintiff's motion for summary judgment and issue a judgment to the Plaintiff in the amount of its non-dischargeable debt. The court will determine the exact amount of non-dischargeable debt to be awarded for the redirected Insurance Policy Commissions and for the attorneys' fees at a hearing to be set by a separate order.

A separate order will enter.

# # #